### Oscar F. Chase *vs.* Jennie S. Chase, executrix.

Worcester.    March 26, 1906. — May 16, 1906.

Present: Knowlton, C. J., Morton, Lathrop, Braley, & Sheldon, JJ.

*Account Stated. Contract,* Consideration. *Equity Jurisdiction.*

To maintain an action at law upon an account stated the account must be founded on a previous relation of debtor and creditor.

An account stated only determines the amount of a debt and cannot create a liability where none existed before.

A promise by one of two brothers to share with the other the property left to the first by their mother is not binding without a consideration.

Where property left to one absolutely by will can be shown by oral evidence to have been intended to be held by him one half for the benefit of another, the remedy of the beneficiary unmentioned in the will, if he has one, is in equity and not at law.

Contract on an account stated, alleging that the plaintiff and the defendant's testator had an accounting together and it was thereupon ascertained that the defendant's testator owed the plaintiff certain sums of money which he agreed to pay to the plaintiff, and to account for to him. Writ dated June 14, 1899.

In the Superior Court the case was referred to an auditor who made certain findings of fact and concluded his report as follows:

"Upon consideration of all the evidence, I find as a fact that there was an accounting between the plaintiff and the defendant's testate and an account stated on Sept. 10, 1892, which was confirmed by the parties on May 31, 1895, that the plaintiff has not been paid from his mother's personal estate the remaining balance of one half the value of the real estate under the terms of said accounting, as shown by the memorandum of Sept. 10, 1892.

"If, upon these facts as found, in the opinion of the court, the plaintiff is entitled to recover for such balance, I find that the plaintiff is entitled to recover of the defendant the sum of $2,659.40 with interest from the date of the writ. Otherwise the finding should be for the defendant."

Later the case was tried before *Pierce,* J.

The plaintiff put in the auditor's report and rested his case.

The plaintiff, Oscar F. Chase, is the son of John Chase, who died in the year 1872, and Elizabeth T. Chase, who died on March 29, 1895.

Frederick T. Chase, the defendant's testator, also was the son of John Chase and Elizabeth T. Chase, and died on January 16, 1898.

It appeared in evidence that from two years or more before April 9, 1887, until after the death of Frederick T. Chase, the plaintiff was a bankrupt.

It also appeared in evidence that on or about April 9, 1887, Elizabeth T. Chase, the mother of the plaintiff and Frederick T., had about $12,000 in personal property, which she had inherited at the decease of her husband, and that that property was then in the hands of Frederick T., as manager for her.

It also appeared that after the death of the father the two sons quitclaimed to the mother two lots with the houses standing thereon, valued approximately at $6,000. Elizabeth T. Chase was at that time living in one of the houses, where she continued to reside until her decease, and she let the other house.

On or about April 9, 1887, Elizabeth T. Chase made a will by the terms of which she willed substantially all of her property both real and personal to Frederick T. Chase, upon the agreement with him, as found by the auditor, and with the knowledge of the plaintiff, that Frederick T. Chase, upon her decease, should divide with the plaintiff the property coming to him from her estate.

Edward Smith, one of the witnesses to the will of Elizabeth T. Chase, testified in relation thereto as follows:

" I knew Elizabeth T. Chase, I had known her from 1848 until the time she died. She died in 1895. I lived in a house not more than four or five rods away from where she lived.

" I used to see her very often, every few days. She talked with me once in a while about her affairs. She was not able to go about much the last years of her life. For seven or eight years before she died she never was even able to go around the house to do anything. She was able to go about the house but she was not able to go out to go to the store and church. She was practically confined to her house and premises for the ten years before she died. I was called upon to witness her will.

That was April 14, 1887. I was called upon to sign the will for her as she was disabled, that is she had paralysis of her right hand so that she couldn't write and had not been able to write for some time. Somebody came after me to witness the will. I went to the house and Mr. Tracy and Oscar Chase and F. T. Chase was there. There was a Mrs. Fosket there. I found Mrs. Chase in bed. I think they were all in the room when I went in. All those parties were there when the will was signed, Frederick and Oscar Chase and the witnesses.

" She did not say anything at that time about the reason for making the will. She did before that. She said she was going to do it. It was not such a great while before she talked with me about what her purpose was as to her property. I had signed a will before for her. I signed two wills. I cannot say how long before making this last will she talked with me about it but not a great while.

" She said she wanted whatever money she had, left to Oscar, but she didn't want his creditors to have it, but she wanted to leave it so he could enjoy it himself. That is all I remember she said. She said she was going to secure Oscar his share of the property by leaving it to Frederick T. Chase. He was to divide it up with Oscar; that is the way she talked with me.

" After I had signed the will for her she says: ' Now, then boys,' that is, speaking to Oscar and Fred, 'if you are satisfied with this I am.' After that she spoke of the will in conversation with me two or three different times. She made about the same remarks that she had before, that what she had left for Oscar was not going to pay any old debts; that seemed to be her understanding at the time. She alluded to the fact afterwards that it was put into Frederick T. Chase's hands for that purpose.

" I had a conversation with Frederick T. Chase a few moments after the signing of the will. He followed me from the bedroom into the sitting room and he says: ' I suppose my mother talked with you something about this will, about her making it in this way,' and I said 'yes, I think I understand,' and he says, ' you know it is done to protect Oscar, it is not for my benefit.' There was nothing said about Oscar's share at that time. This was all said after the will was made."

After the making of the will on April 9, 1887, Frederick T. Chase lent to the plaintiff various sums of money from time to time as an advancement against the interest in the estate of Elizabeth T. Chase which should be coming to the plaintiff upon her decease; and on July 1, 1892, the amount of the loans or advancements so made with interest thereon amounted to $3,073.71.

On September 10, 1892, Frederick T. Chase stated his account to the plaintiff, showing the amount of property then represented in the estate of Elizabeth T. Chase, and the amount of advancements which had been made to the plaintiff on account of his half interest in that property up to that date; which statement was evidenced by a memorandum in writing, which appeared in the auditor's report.

Various advancements were made from time to time by Frederick T. Chase to the plaintiff from September 10, 1892, up to March 29, 1895, the date of the decease of Elizabeth T. Chase, and the will made in 1889 was probated on April 30, 1895.

A memorandum was put in evidence, made by the direction of Elizabeth T. Chase in September, 1892, directing how her estate should be distributed and providing, among other things, for giving to the plaintiff only certain furniture and other household property, and for giving both of her houses to Frederick T. Chase.

On May 31, 1895, the plaintiff had an interview with Frederick T. Chase concerning the division of the property of the estate of Elizabeth T. Chase between them, and the plaintiff testified in relation thereto as follows:

"I told my brother that my mother at the time she wrote that paper she was mad with me about certain things and was thinking that I was spending more money than I ought, and from the time that paper was made until the time she died there had been a change in her opinion of things; that it was wrote in 1892, and that from 1892 to 1895 she had changed her mind. I had got married in the meantime. I told him that my mother was mad when she wrote that paper, and that she was an old woman and hard of hearing, and that his sons had lied to her in order to get money to go off and spend for their rum, and that

she had changed her mind since she wrote that paper, because I had married and had children. The woman I went with she was mad because I was going with, and she changed her mind after I married the woman. I told my brother that my mother was mad with me because I was going with a certain woman and that after I was married and had children born she had changed her mind from the time she wrote that paper until when she died, or previously to her dying, that she did give me some money, but that she had never given me any before, but made the baby a present of twenty dollars. I told my brother she wouldn't have written that paper I didn't think before she died.

" I saw her the Saturday night before she died and she wanted to know if my brother was doing anything for me, and I told her not to worry over these matters, that I would trust my brother to do what was right by me. I told him that. He said he would ignore the paper and pay me $3,000 on the real estate and one half of my mother's balance when the business was settled."

At the decease of Elizabeth T. Chase the amount of money in the hands of Frederick T. Chase, as shown by his books containing the account of Elizabeth T. Chase, was $8,298.73, and a book entry afterwards made in relation thereto was as follows: " On June, 1896, Frederick T. Chase advanced to Oscar F. Chase      dollars as shown by his books."

On September 17, 1892, Elizabeth T. Chase directed one Mrs. Frances Stearns, who then was caring for her, to write the memorandum above mentioned. The testimony of Mrs. Stearns in reference to making that paper and what she did with it, is as follows:

" I wrote the paper at her request. She said that Oscar had his already, and she did not desire him to have any more; and she wished to place it so it would be beyond his reach. I wrote just what she told me. After I had written it she read it. The paper is my writing. There was nothing said to me about my signing it. After it was done she said she wished to put it under lock and key. She read it and then I kept it and it was given to Mr. Fred. Chase. I gave it to him about three or four weeks after I wrote it.

"She said in that conversation that she didn't wish Oscar to have any more money as he had his part already, and he made very bad use of money and she didn't wish him to have any more. I gave the paper to Mr. Fred. Chase at her request."

The plaintiff, Oscar F. Chase, lived with his mother, taking care of her and doing general work for her from July, 1887, to August, 1894.

The foregoing facts and evidence and the auditor's report were all the facts and evidence material to the issue.

Before the case was taken from the jury the following colloquy between the judge and counsel took place:

The counsel for the plaintiff was asked by the judge if he was prepared to show that F. T. Chase induced his mother to make a will in his favor, on the strength of his promise to her that he would give his brother Oscar Chase one half the property referred to in the will.

The counsel answered: "I don't say F. T. Chase induced his mother to make the will, but such a will was made on such understanding by the mother of her own notion and acquiesced in by her and her two sons." When asked if F. T. Chase was under any legal obligation to his brother Oscar, up to the time of his mother's death, the counsel answered: "Only so far as he was bound to carry out the understanding entered into when the will was made."

The judge inquired whether the counsel thought that the oral instructions given by the mother to F. T. Chase could not by subsequent written memoranda be modified if the person, as in this case F. T. Chase, in whose favor the will was made, was willing. The reply of the counsel was: "I think there having been an accounting in 1892, which was acknowledged after the mother's death in 1895, that I can maintain this action in its present form."

The judge then said: "It seems to me that if the plaintiff can recover anything on the facts as herein claimed, he must seek his relief on the equity side of the court. I don't say he has any remedy there, for to fasten a trust upon an absolute devise, there must be some kind of a promise given by the devisee to the testatrix, which, if not carried out, would be a fraud upon the testatrix. Where a devisee obtains a devise abso-

lute in form by reason of a promise that he will give some of the property to a person named by the testatrix, it creates a secret trust, which, being established, and the evidence must be clear and satisfactory, a court of equity will compel its performance.

" But, in this case, the oral instructions given by the testatrix Chase would not, where the devisee did not object, prevent the mother from giving a subsequent written memorandum of how she wished her property disposed of after her death. Now the devisee in this case follows out the written instructions given him, fairly, and doing so, I am of the opinion that it works no fraud upon the testatrix. Entertaining this view of the law, I don't think you offer enough to entitle you to go to the jury on the law side of this court."

The judge ruled that the plaintiff could not maintain an action at law upon the facts above stated, and ordered a verdict for the defendant. The plaintiff alleged exceptions.

*E. H. Vaughan,* for the plaintiff.

*C. Haggerty & J. R. Kane,* for the defendant.

LATHROP, J. We are of opinion in this case that an action at law cannot be maintained on an account stated. An account stated must be founded on previous transactions of a monetary character creating the relation of debtor and creditor. *Lubbock* v. *Tribe,* 3 M. & W. 607. *Mellon* v. *Campbell,* 11 Penn. St. 415. It cannot be made the instrument to create a liability where none before existed, but only determines the amount of a debt where liability exists. *Austin* v. *Wilson,* 33 N. Y. St. Rep. 503.

On the facts found by the auditor, there was no legal liability existing on the part of the defendant's testator towards the plaintiff, on May 31, 1895, after the death of the mother; and the alleged promise of the defendant's testator to share equally with the plaintiff the proceeds of the mother's estate was without consideration and void.

If the property left by the will of the mother to the defendant's testator absolutely can be shown by oral evidence to have been intended one half for the plaintiff, his remedy is in equity and not at law. *Olliffe* v. *Wells,* 130 Mass. 221. *Dowd* v. *Tucker,* 41 Conn. 197. *Hooker* v. *Axford,* 33 Mich. 453. *Gilpatrick* v. *Glidden,* 81 Maine, 137.

*Exceptions overruled.*